# UNITED STATES DISTRICT COURT
for the

Central District of California

**ORIGINAL**

United States of America

v.

SHANT OHANIAN,
SILVA SEVLIAN OHANIAN
aka "Silva Sevlian,"

Defendants

Case No.



FILED
CLERK, U.S. DISTRICT COURT
APR 17 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**19 MJ01568**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or about July 2013 and September 2018, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

LODGED
2019 APR 17 AM 11:09
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: _____

Sworn to before me and signed in my presence.

Date: April 17, 2019

_____
Complainant's signature

Jeremy O'Hara, Senior Special Agent
*Printed name and title*

_____
Judge's signature

City and state: Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Jeremy M. O'Hara, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Senior Special Agent ("SSA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Office of Professional Responsibility ("OPR"), where I investigate matters concerning employee misconduct, bribery involving ICE employees, individuals who impersonate ICE employees, and individuals who commit violations that injure or discredit the reputation of ICE. I am assigned to the Office of the Special Agent in Charge- West ("SAC West"), located in Long Beach, California.

2. I have been assigned to SAC West since on or about May 31, 2016, and have participated, as both the case agent and a supporting agent, in a variety of different types of investigations, such as: employee misconduct, sexual battery, stolen government property, federal firearms violations, financial investigations, and impersonation of a federal employee.

3. Previously, I served as a Homeland Security Investigations ("HSI") Special Agent ("SA"), beginning in December 2008. While assigned to HSI, I participated in numerous criminal investigations as either the case agent or an investigating agent. In particular, I participated in various aspects of criminal investigations, including: wiretapping telephones, telephone records analysis, electronic surveillance,

physical surveillance, search warrants, and arrests. I also interviewed defendants, sources of information, confidential informants, and witnesses who had personal knowledge regarding criminal organizations and methodology.

4. To become a SA, I received approximately three months of basic training, followed by approximately three months of advanced training at the Federal Law Enforcement Training Center ("FLETC"). After arriving at HSI, I successfully completed a two-year, on-the-job training program. I have been involved in numerous investigations concerning violations of federal statutes related to financial crimes. I have also spoken to numerous law enforcement agents regarding their experience in investigating financial criminal offenses.

## II. **PURPOSE OF AFFIDAVIT**

5. This affidavit is made in support of a criminal complaint against, and arrest warrants for, SHANT OHANIAN ("OHANIAN") and SILVA SEVLIAN OHANIAN, also known as "Silva Sevlian" ("SEVLIAN"), for a violation of 18 U.S.C. § 1343 (wire fraud).

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

7. Law enforcement agents began investigating OHANIAN in mid-February 2017, after the United States Attorney's Office for the Central District of California received a referral from Investigator Benson Hom of the State Bar of California (the "State Bar"), in which Investigator Hom indicated OHANIAN may have committed violations of federal law as part of a scheme to defraud his legal clients. OHANIAN became a licensed member of the California State Bar in January 2012 and was disbarred in December 2017.

8. During the course of my investigation, I have identified numerous victims who reported that they retained OHANIAN as their attorney to represent them in various types of legal matters. The victims reported that OHANIAN defrauded them by claiming that OHANIAN obtained favorable legal resolutions for his clients when, in fact, OHANIAN had not obtained favorable resolutions and, in many cases, had never initiated a legal action. My investigation has also revealed that SEVLIAN (OHANIAN's wife) participated in the scheme with OHANIAN by delivering fraudulent legal documents to a victim and making disguised phones calls to multiple victims to perpetuate the fraudulent scheme.

9. During a consensual interview I conducted with OHANIAN, OHANIAN admitted to defrauding multiple victims, including Victims[1] 7 and 8.[2]

### IV. STATEMENT OF PROBABLE CAUSE

#### A. Wire Fraud Involving Victim 7

10. The information described below was, in part, obtained from documents and statements Victim 7 provided to the Los Angeles Sheriff's Department and the State Bar. I also interviewed Victim 7 on multiple occasions.

11. On or about September 15, 2017, Victim 7 reported to the Los Angeles Sheriff's Department that Victim 7 had retained OHANIAN as an attorney in a civil real estate matter and that OHANIAN had defrauded Victim 7 by fraudulently requiring Victim 7 to pay over $2 million to OHANIAN in nonexistent fees related to the real estate transaction.

12. Victim 7 reported that Victim 7 retained OHANIAN in July 2013 to assist Victim 7 in the recovery of a deposit of $500,000 related to a failed commercial real estate transaction for a shopping center in Ontario, California (the "Shopping Center"). After being retained, OHANIAN represented Victim 7 in a deposition related to the matter. Following the deposition, OHANIAN falsely informed Victim 7 in February 2016 that Victim 7

---

[1] The numbering system for victims corresponds to other pleadings the government anticipates filing in this matter. This pleading discusses only four of OHANIAN's multiple fraud schemes for which I have uncovered evidence, and thus only references Victims 5, 6, 7, and 8.

[2] OHANIAN claimed, however, that his wife SEVLIAN was not involved in his fraudulent conduct.

had prevailed and would receive $1.2 million in damages, plus penalties in matter related to the Shopping Center.

13. On or about February 5, 2016, OHANIAN presented Victim 7 with a counterfeit check for approximately $1,925,477, which Victim 7 attempted to negotiate but the bank rejected as counterfeit. OHANIAN denied to Victim 7 that the check was counterfeit and, on or about March 25, 2016, OHANIAN presented Victim 7 with a check for $7,244,211.45, which Bank of America later confirmed to me was counterfeit.

14. During the course of the purported representation, OHANIAN falsely informed Victim 7 that OHANIAN represented Victim 7 in a parallel bankruptcy proceeding related to the Shopping Center. Victim 7 reported that OHANIAN provided Victim 7 with numerous pleadings purporting to be from the U.S. Bankruptcy Court and that OHANIAN used these pleadings to solicit additional funds from Victim 7 that OHANIAN represented were necessary for Victim 7 to acquire the Shopping Center.

15. In or around April 2017, while Victim 7 was traveling in Florida and the Bahamas, defendant, who was located in California, called Victim 7 by telephone and instructed Victim 7 to pay "unpaid court fees" to defendant even though Victim 7 owed no such court fees.

16. Victim 7 reported that on two or three occasions, an Armenian female delivered documents purportedly from the U.S. Bankruptcy Court to Victim 7 at Victim 7's residence. I confirmed with the U.S. Bankruptcy Court that the documents that were delivered to Victim 7 were fraudulent. Some of the

5

fraudulent court documents included documents with the signature of a real U.S. Bankruptcy Judge, which I confirmed with the Judge were forged. On or about February 13, 2018, I interviewed Victim 7 and presented Victim 7 with a photographic lineup of 12 females on two sheets of paper. Victim 7 made a written notation of "I believe the person who delivered bankruptcy contract document" next to the photograph that I knew to depict SEVLIAN. Victim 7 reported that the individual he identified delivered fraudulent bankruptcy documents to Victim 7 on multiple occasions. In addition, on June 20, 2018, Victim 7 reported to me that after the February 13, 2018, interview, Victim 7 saw a Facebook photo of SEVLIAN[3] and confirmed that SEVLIAN was the courier who delivered fraudulent documents from the U.S. Bankruptcy Court to Victim 7 on multiple occasions.

17. Victim 7 also reported receiving multiple calls from a female who claimed to be the court clerk for the U.S. Bankruptcy Judge purportedly assigned to hear Victim 7's bankruptcy matter (the "Clerk"). The Clerk called from a number that showed up on Victim 7's "called ID" as a number affiliated with the U.S. Bankruptcy Court. The Clerk instructed Victim 7 to pay OHANIAN. Victim 7 further reported that on three occasions OHANIAN drove Victim 7 to a purported hearing in the U.S. Bankruptcy Court. During each car ride, OHANIAN received a telephone call, which OHANIAN answered using the car's speaker system. In each of

---

[3] Victim 7's son knew SEVLIAN through mutual friends while attending a graduate school program. Victim 7's son showed Victim 7 a photograph of SEVLIAN through the son's Facebook account.

those calls, Victim 7 heard the Clerk inform OHANIAN the court was busy with another case and would not have time to hear Victim 7's case.  After each call, OHANIAN would return Victim 7 to Victim 7's residence before reaching the U.S. Bankruptcy Court.

18.  On an unknown date after September 2017, OHANIAN called Victim 7's cellular telephone and OHANIAN had Victim 7 speak with SEVLIAN.  Victim 7 reported to me that he immediately recognized SEVLIAN's voice as the voice of the Clerk.  During that call, SEVLIAN discouraged Victim 7 from reporting OHANIAN to law enforcement and SEVLIAN told Victim 7 his money would be returned from a foreign country.  During that same call, Victim 7 confronted OHANIAN and told OHANIAN that Victim 7 knew SEVLIAN was the Clerk.  OHANIAN insisted to Victim 7 that SEVLIAN was not the Clerk.  OHANIAN reminded Victim 7 that OHANIAN had kids and begged Victim 7 not to involve SEVLIAN.  OHANIAN claimed to Victim 7 that OHANIAN was the Clerk and that he had disguised his voice as a female's voice during the calls from the Clerk. I am aware that this explanation is inconsistent with OHANIAN receiving calls from the Clerk while in the presence of Victim 7, as described above.

19.  On September 6, 2018, I conducted a consensual, Mirandized interview of OHANIAN at the ICE OPR Office in Long Beach, California, which I audio and video recorded (the "September 2018 Interview").  During that interview, OHANIAN admitted he provided Victim 7 with numerous counterfeit documents from the U.S. Bankruptcy Court as well as other

7

financial institutions. OHANIAN stated he found many of the signatory names and the letterhead he utilized on the Internet.

20. OHANIAN admitted all checks given to Victim 7 were counterfeit and stated that he produced the counterfeit checks on his computer, using routing numbers OHANIAN located on the Internet. OHANIAN admitted to stealing over $2 million from Victim 7.

21. OHANIAN admitted that he directed SEVLIAN to deliver fraudulent documents to Victim 7 on one occasion but otherwise denied that SEVLIAN was involved in the fraudulent conduct targeting Victim 7. OHANIAN claimed that the individual who called Victim 7 as the Clerk was OHANIAN's sister and that his sister only called on the occasions when OHANIAN was in the car with Victim 7. OHANIAN claimed he used a voice disguiser for the remaining calls from the Clerk. I know this explanation to be inconsistent with Victim 7 reporting that the Clerk who called Victim 7 directly on multiple occasions had the same voice as the individual who called OHANIAN during the purported trips to the U.S. Bankruptcy Court, and Victim 7 recognized SEVLIAN as the voice on the calls to Victim 7.

B. **Wire Fraud Involving Victims 5 and 6**

22. In or about January 2015, defendant agreed to represent Victim 5 and 6 in a commercial dispute between the company owned by Victims 5 and 6 ("Company A") and a foreign company ("Company B").

23. Company B filed an arbitration claim against Company A in December 2014, claiming damages of $1,093,300. Victims 5 and

6 retained defendant to respond to the arbitration claim, which defendant falsely claimed to Victims 5 and 6 he did.

24.  In June 2016, defendant provided Victims 5 and 6 with a counterfeit letter purportedly sent by the U.S. Department of Justice, Office of Legal Policy, Office of Foreign Civil Affairs, California Division, indicating that an action had been filed on Company A's behalf.  As part of this purported action, defendant required Victims 5 and 6 to pay $90,000 in "bonds" to OHANIAN that defendant falsely claimed were required to proceed.

25.  Between approximately early 2017 and early 2018, defendant falsely promised that Victims 5 and 6 would receive a judgment in their favor in the amount of $3 million.  In an effort to conceal his lies, defendant provided Victims 5 and 6 with counterfeit wire transfer receipts indicating purported judgment money had been transferred to Victims 5 and 6, when, in fact, Victims 5 and 6 never received the purported wire transfers.

### C. Analysis of "Spoofed" Call Records

26.  "Spoofing" is an industry term referring to the utilization of a computer to alter the caller identification number displayed on a receiver's handset to display another telephone number provided by the initiator of the telephone call.  I am aware that there are multiple online companies offering spoofing services in which a user can use a phone-based application or the website to make a spoofed call.

27.  I obtained business records from spoofing call services Bluff My Call and SpoofCard, which were both used as

9

part of the fraudulent scheme. I found evidence that spoofed calls made to victims of the fraudulent scheme were also made using Itellas Communications but I have been unable to obtain records from Itellas Communications to date.

28. A review of the spoofed call records obtained to date revealed the following:

    a. Approximately 80 spoofed calls to Victim 7 originated from a cell phone number that OHANIAN used to contact me on multiple occasions and that OHANIAN admitted to me was the number he used.

    b. The cellular phone number ending in -4318 ("SEVLIAN's Number") made at least two spoofed calls to OHANIAN. On or about September 13, 2018, I spoke to SEVLIAN on SEVLIAN's Number and Victim 7's son also reported to me that he had a conversation with SEVLIAN on SEVLIAN's Number.

    c. SEVLIAN's Number made a spoofed call to Victim 6, in which the call appeared to originate from a number associated with U.S. Bank.

    d. SEVLIAN's Number made a spoofed call to another victim (Victim 8) who resides in the Netherlands. The call to Victim 8 appeared to originate from a number associated with the Chase Bank Fraud Department. During the September 2018 Interview, OHANIAN admitted that he defrauded Victim 8. Based on the foregoing, I believe it is likely that SEVLIAN also participated in defrauding Victim 8.

    e. Approximately 1 spoofed call to Victim 7 originated from a cell phone number ending in -5314 (the "5314

Number"). The call appeared to originate from a number associated with the U.S. District Court for the Central District of California. I later spoke to SEVLIAN's mother and determined that the 5314 Number was the number of SEVLIAN's mother's cell phone. Based upon my investigation to date, including my interview of SEVLIAN's mother, I believe SEVLIAN's mother had no role in the commission of the fraud scheme but instead SEVLIAN or OHANIAN used SEVLIAN's mother's cell phone to further disguise their roles in the fraudulent scheme.

   f. The 5314 Number also made approximately two spoofed calls to Victim 6, in which the call appeared to originate from a number associated with the Los Angeles County Hall of Records.

## V. CONCLUSION

  29. For all the reasons described above, there is probable cause to believe that SHANT OHANIAN and SILVA SEVLIAN OHANIAN have committed a violation of 18 U.S.C. § 1343 (wire fraud)

_____
Jeremy M. O'Hara, Senior
Special Agent, ICE/OPR

Subscribed to and sworn before me
this 17 day of April, 2019.

_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE